# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

|  |  |
|---|---|
| KUMAR INDUSTRIES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v.  ) | Court No. 21-00622 |
| ) | |
| THE UNITED STATES, ) | **PUBLIC VERSION** |
| ) | |
| Defendant. ) | |

## DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR <u>JUDGMENT UPON THE AGENCY RECORD</u>

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Assistant Director

OF COUNSEL:
JARED M. CYNAMON
Attorney
Office of the Chief Counsel
  for Trade Enforcement & Compliance
U.S. Department of Commerce
Washington, D.C.
Telephone: (202) 482-0131

KELLY GEDDES
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel.: (202) 307-2867
Email: Kelly.Geddes2@usdoj.gov

September 26, 2022

*Attorneys for Defendant United States*

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE TIMONTHY C. STANCEU, SENIOR JUDGE**

| | | |
|---|---|---|
| KUMAR INDUSTRIES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 21-00622 |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

Upon consideration of plaintiff's motion for judgment on the agency record, defendant's response thereto, plaintiff's reply, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiff's motion is DENIED; and it is further

ORDERED that the Department of Commerce's Final Results are sustained; and it is further

ORDERED that judgment is entered in favor of the United States.


Dated: _____        _____
New York, New York                            Judge

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................................... ii

STATEMENT PURSUANT TO RULE 56.2 ................................................................................ 1

   I.   Administrative Decision Under Review ........................................................................... 1

   II.  Issue Presented ................................................................................................................. 2

STATEMENT OF FACTS ............................................................................................................. 2

SUMMARY OF THE ARGUMENT ............................................................................................. 8

ARGUMENT ................................................................................................................................. 9

   I.   Standard Of Review ......................................................................................................... 9

   II.  Commerce's Application Of Adverse Facts Available Was Appropriate Because There Was Insufficient Evidence On The Record To Determine Kumar's Affiliation With Companies A and B ......................................................................................................... 10

      A.   Commerce Reasonably Decided To Use Facts Otherwise Available ........................... 10

      B.   Commerce Reasonably Decided To Apply Adverse Facts Available ........................... 16

CONCLUSION ............................................................................................................................ 21

## TABLE OF AUTHORITIES

## CASES

*Ad Hoc Shrimp Trade Action Committee v. United States*, 802 F.3d 1339, 1357 (Fed. Cir. 2015) ........................................................................................................................................ 22

*Atl. Sugar, Ltd.*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) ................................................................ 12

*Borden, Inc. v. United States*, 4 F. Supp. 2d 1221 (Ct. Int'l Trade 1998) .................................... 22

*Carpenter Tech. Corp. v. United States*, 2002 Ct. Intl. Trade LEXIS 76 (Ct. Int'l Trade July 30, 2002)......................................................................................................................... 13, 18

*Changzhou Wujin Fine Chemical Factory Co., Ltd. v. United States*, 701 F.3d 1367, 1379 (Fed. Cir. 2012) ............................................................................................................................. 22

*Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938) .................................................. 12

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)............................................................ 12

*De Mexico v. United States*, 753 F.3d 1227 (Fed. Cir. 2014)....................................................... 22

*Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1295-96 (Fed. Cir. 2021) ................. 19

*Deosen Biochemical Ltd. v. United States*, 301 F. Supp. 3d 1372, 1378-79 (Ct. Int'l Trade, 2018) ........................................................................................................................................ 21

*Gerber Food (Yunnan) Co., Ltd. v. United States*, 491 F. Supp. 2d 1326, 1347 (Ct. Int'l. Trade 2007)........................................................................................................................................ 21

*Hubbell Power Sys. v. United States*, No. 15-00312, 2019 WL 6174713, at *2 (Ct. Int'l Trade Nov. 20, 2019)................................................................................................................ 19, 20

*INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992).................................................................. 12

*Mannesmannrohren-Werke AG & Mannesmann Pipe & Steel Corp. v. United States*, 77 F. Supp. 2d 1302, 1316 (Ct. Int'l Trade 1999) ...................................................................................... 22

*Myland Industrial, Ltd. v. United States*, Slip Op. 07 - 154, (Ct. Int'l Trade Oct. 25, 2007) ....... 22

*National Nail Corp. v. United States*, 390 F. Supp. 3d 1356, 1385 (Ct. Int'l Trade 2019) .......... 21

*Nippon Steel Corp. v United States*, 337 F.3d 1373, 1382–83 (Fed. Cir. 2003)............... 19, 20, 21

*Papierfabrik August Koehler SE v. United States,* 843 F.3d 1373, 1379 (Fed. Cir. 2016) .......... 19

*Prosperity Tieh Enter. Co. v. United States*, 965 F.3d 1320, 1323 (Fed. Cir. 2020) ................... 18

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) ............................. 18

*Shandong Huarong Machinery Co., Ltd. v. United States*, 435 F. Supp. 2d 1261, 1277 (Ct. Int'l Trade 2006) ........................................................................................................................ 21

*Slater Steels Corp. v. United States*, 279 F. Supp. 2d 1370, 1376, (Ct. Int'l Trade 2003) ........... 18

*Tianjin Tiancheng Pharm. Co. v. United States*, 366 F. Supp. 2d 1246, 1249 (Ct. Int'l. Trade 2005) .............................................................................................................................. 12

*Timken U.S. Corp. v. U.S.*, 434 F.3d 1345 (Fed. Cir. 2006) .......................................................... 22

*Uniroyal Marine Exps. Ltd. v. United States*, 626 F. Supp. 2d 1312, 1316 (Ct. Int'l. Trade 2009) ........................................................................................................................................ 13

*Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993) .............................. 13

## STATUTES

19 U.S.C. § 1516a ........................................................................................................................ 12

19 U.S.C. § 1677 .................................................................................................................... 14, 18

19 U.S.C. § 1677e ........................................................................................................ 10, 14, 19, 20

19 U.S.C. § 1677m .................................................................................................................. 14, 16

## REGULATIONS

19 C.F.R. § 351.102 .................................................................................................................... 14

## OTHER AUTHORITIES

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, vol. 1, at 870 (1994)        23

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

|  |  |  |
|---|---|---|
| KUMAR INDUSTRIES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 21-00622 |
| | ) | |
| THE UNITED STATES, | ) | **PUBLIC VERSION** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S RESPONSE IN OPPOSITION TO PLANTIFF'S MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, defendant, the United States, respectfully submits this response to the motion for judgment on the agency record filed by plaintiff Kumar Industries (Kumar) challenging the United States Department of Commerce's (Commerce) final results in the administrative review of the antidumping duty order on glycine from India.  As explained below, the motion should be denied because Commerce's determination is supported by substantial evidence and is otherwise in accordance with law.

### STATEMENT PURSUANT TO RULE 56.2

### I.    Administrative Decision Under Review

The administrative determination under review is *Glycine from India:  Final Results of Antidumping Duty Administrative Review; 2018-2020*, 86 Fed. Reg. 62,509 (Dep't of Commerce

Nov. 10, 2021) (Final Results) (P.R. 201)[1] and its accompanying Issues and Decision

Memorandum (IDM) (P.R. 200).  The period of review is October 31, 2018, through May 31,

2020.  *Id*.

## II.    Issue Presented

Whether Commerce's determination to use an adverse inference when selecting from

among the facts otherwise available on the record was supported by substantial evidence and in

accordance with law because Kumar withheld information preventing Commerce from

determining whether [████████████████████], Company A or [████████████

█████████████], Company B was affiliated with Kumar.[2]

## STATEMENT OF FACTS

On June 21, 2019, Commerce published in the *Federal Register* an antidumping duty

order on glycine from India.  *See Glycine from India and Japan:  Amended Final Affirmative*

*Antidumping Duty Determination and Antidumping Duty Orders*, 84 Fed. Reg. 29,170 (Dep't of

Commerce June 21, 2019) (Order).

On June 2, 2020, Commerce published in the *Federal Register* a notice of opportunity to

request an administrative review of the Order.  *See Antidumping and Countervailing Duty Order,*

*Finding or Suspended Investigation; Opportunity to Request Administrative Review,* 85 Fed.

Reg. 33,628 (Dep't of Commerce June 2, 2020).  On August 6, 2020, Commerce initiated the

administrative review of the Order, and on September 23, 2020, Commerce selected Kumar

Industries (Kumar) as one of two mandatory respondents.  *See Initiation of Antidumping and*

*Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 47,731, 47,734 (Dep't of Commerce

---

[1]  Citations to public documents from the administrative record are identified as "P.R. ___,"
while citations to confidential record documents are identified as "C.R. ___."

[2]  The identities of Company A and Company B are business proprietary information.

August 6, 2020) (P.R. 9); *see also* Memorandum, "Administrative Review of the Antidumping Order on Glycine from India:  Respondent Selection Memorandum," (September 23, 2020) (C.R. 4) (P.R. 16).

On September 29, 2020, Commerce issued its initial questionnaire to Kumar and requested that Kumar submit its Section A Response regarding its corporate structure and affiliations by October 20, 2020, and the remaining sections of its initial response by November 5, 2020. *See* Initial Questionnaire (September 29, 2020) (P.R. 20) (Initial Questionnaire) at A-3-6, A-9-10; B-2-3.  On October 20, 2020, Kumar timely submitted its Section A Response. *See Certain Glycine from India* (A-533-883) Kumar Industries, India Submission of Section A Questionnaire Response (October 20, 2020) (C.R. 9) (P.R. 35) (Section A Response).

In the Section A Response, Kumar reported that it had no sales to affiliates in the home market or third country. *Id.* at 2.  Specifically, Kumar maintained that [███████████] are affiliated with any other persons that are involved in the manufacture, sale, or development of the product under review (including all inputs). *Id.* at 7 and at Exhibit A-3 (C.R. 13).  Kumar stated that it does not directly or indirectly own, hold, or control with power to vote five percent or more of the outstanding voting stock in any company. *See id.* at 7.  In addition, Kumar provided that the [████████], which owns Kumar, has ownership interest in other affiliated companies but none of these affiliates were engaged in the development, production, sale or distribution of subject merchandise during the period of review. *See id.* at 8.  Kumar also responded that it is not affiliated with any other producer in India that manufactures or has the potential to manufacture the subject merchandise, and it listed their sales to Company A as sales to an unaffiliated home market customer. *See id.* at 10-11.  Kumar reported that during the

period of review, it was not affiliated with any suppliers of the merchandise under review or of inputs to produce the subject merchandise.  *See id.*

Kumar submitted its Section B and Section C responses on November 12, 2020, after requesting and receiving a seven-day extension on its Section B-D responses.  *See* Kumar Industries, India Submission of Section B Questionnaire Response (November 12, 2020) (C.R. 74) (P.R. 65-66) (Section B Response).  It submitted its Section D response on November 27, 2020, after missing the November 12 deadline and asking for and receiving a second, fifteen-day extension on that section.  *See* Response Section D Questionnaire Extension (November 18, 2020) (P.R. 70).  Commerce rejected the Section D response because it contained unsolicited revisions to the Section B-C responses, and Kumar timely refiled the Section D response on December 12, 2020.  *See* Commerce Letter Rejecting Section D Response (December 10, 2020) (P.R. 93); Glycine from India (A-533-883) Kumar Industries, India resubmission of Section D Questionnaire response (December 12, 2020) (C.R. 98-100) (P.R. 94) (Section D Response).

In its Section B response, Kumar reported its home market sales to Company A as sales to an unaffiliated home market customer.  *See generally* Section B Response.  In its Section D response, it reported its purchases of major inputs from Company B as purchases from an unaffiliated supplier.  *See generally* Section D response.

On February 1, 2021, Commerce issued a second supplemental questionnaire, which specifically asked about Companies A and B and whether they were affiliated with Kumar or supplied inputs to Kumar for Kumar's production of glycine.  *See* Second Supplemental Questionnaire (February 1, 2021) (P.R. 117) at 4-5.  Commerce also requested audited financial statements for Company B.  *See id.* at 5.  On February 15, 2021, the day before the deadline, Kumar requested a one-week extension of the deadline, which Commerce granted.  *See* Request

4

for Extension of Time, Supplemental Questionnaire (February 15, 2021) (P.R. 122); Response

Granting Extension to Kumar Industries for Second Supplemental Questionnaire (February 16,

2021) (P.R. 123).

On February 23 and 24, 2021, Kumar timely submitted its second supplemental

questionnaire response.  *See* Submission of Section A to D Supplemental Questionnaire

Response (February 24, 2021) (P.R. 125) (Second Supplemental Response).  Kumar provided

that its partners had sold Company A before the beginning of the period of review.  *See id.* at 6.

Kumar also reported that it previously jointly owned Company B but withdrew its ownership in

2013, and therefore reported its purchases of major inputs from Company B as purchases from

an unaffiliated supplier.  *Id.*  Kumar also provided retirement deeds evidencing the Kumar

partners' retirement from both Companies A and B.  *See* Exhibits A-18 & A-18(a) to Second

Supplemental Response (C.R. 130-31).

On April 1, 2021, Commerce issued a third supplemental questionnaire.  *See* Third

Supplemental Questionnaire (April 1, 2021) (P.R. 137).  Commerce requested income tax returns

for Kumar's partners, and asked if any of [███████████████████] received income from

Company A or B and to describe the nature of the income and why they continue to receive such

income.  *Id.* at 3.  Commerce further explained that the retirement deed provided for Company B

in the second supplemental response was illegible and requested Kumar to re-submit it.  *Id.*

Commerce also stated that although in the second supplemental response Kumar said that it

reported master information on the directors of Company A, Kumar did not attach an exhibit

with such information, so Commerce requested for them to do so.  *Id.* at 4.

Kumar submitted its response to the third supplemental questionnaire on April 22, 2021,

after requesting and receiving a nine-day extension.  *See* Kumar's Third Section A Supplemental

Response (April 22, 2021) (Third Supplemental Response) (C.R. 149-67) (P.R. 146).  Kumar

provided a legible copy of the requested retirement deed, as well as master information of

Company A.  *Id.* at 3-4; *Id.* at Exhibit A-20 (Master Information); Exhibit A-23 to Third

Supplemental Response (C.R. 159) (deed).  Kumar also provided the requested tax returns and

reported that none of the partners received any income from any of the companies for which

Kumar provided the retirement deed or dissolution deed in the second supplemental response.

*See id.* at 1-3.  However, the tax returns of one partner, [█████████████], show

showed that the partner received income from Companies A and B during the period of review.

*See id.* at 3; Exhibit A-21.1 to Third Supplemental Response (C.R. 153).

On May 10, 2021, Commerce issued a fourth supplemental questionnaire to address these

inconsistencies.  *See* Fourth Supplemental Questionnaire (May 10, 2021) (C.R. 186) (P.R. 151).

Specifically, Commerce asked when [████████████████] became a shareholder of

partnership firms with the tax-return identification of [█████████████] and [████

█████████], whether these partnership firms were Companies A and B, and if so, why

Kumar reported in previous responses that the companies were not affiliated. *See id.* at 4-5.   The

permanent account number (PAN) is a ten-digit alphanumeric code that an Indian tax assessing

officer may assign to any person for identification purposes.

Kumar responded to the fourth supplemental questionnaire on May 24, 2021, after

seeking and receiving an eight-day extension of the deadline.  *See* Glycine from India (A-533-

883) Kumar Industries, India submission of Section-A 4th Supplemental Questionnaire Response

(May 24, 2021) (C.R. 188-89) (P.R. 157) (Fourth Supplemental Response).  Kumar claimed that

a tax consultant had erroneously classified interest income from advance and capital due in

Companies A and B as income from operation of the partnership, but in fact the amounts were

interest on loans and payment of consideration for the transfer of shares upon the partners' retirement. *Id.* at 4.

On June 30, 2021, Commerce issued its Preliminary Results, with a preliminary determination that the use of an adverse inference was necessary in selecting from among the facts otherwise available on the record (application of adverse facts available, or AFA). Commerce based that decision on the fact that Kumar reported inconsistent answers to the multiple questionnaires regarding the affiliation status between Kumar, its largest home market customer, and its largest home market supplier. *See Glycine from India: Preliminary Results of Antidumping Duty Administrative Review; 2018-2020*, 86 Fed. Reg. 35,733 (Dep't of Commerce July 7, 2021) (Preliminary Results) (P.R. 177), and accompanying Preliminary Decision Memorandum (PDM) (P.R. 164). Additionally, Commerce issued its Preliminary AFA Memorandum detailing the bases for its determination. *See* Preliminary Application of Adverse Facts Available to Kumar Industries (June 30, 2021) (C.R. 197) (P.R. 167) (Preliminary AFA Memo). Commerce determined that a Kumar partner's receipt of income from Companies A and B undermined the credibility of the retirement deeds because it raised the question of whether this partner had completely retired from the partnership of Companies A and B. *See* PDM at 6. As such, Commerce found that Kumar failed to provide an accurate, complete, and consistent response to its questions concerning affiliation, and thereby significantly impeded Commerce's ability to closely review Kumar's data and calculate an accurate margin within the meaning of 19 U.S.C. § 1677e(a)(2)(C). *See id* at 6-7. Commerce further determined that Kumar failed to cooperate by not acting to the best of its ability in responding to Commerce's request for information regarding its affiliation status with Companies A and B, and, thus, Commerce was unable to determine whether Kumar's home market sales to Company A were sales to an affiliate

that would therefore require data for downstream sales, and whether Kumar's purchases of major inputs from Company B were purchases from an affiliated supplier that would therefore warrant a major input adjustment.  *See id*.; *see also* 19 U.S.C. § 1677e(b).

On November 4, 2021, Commerce published the Final Results of review, which continued to apply adverse facts available for Kumar.  *See* IDM at 23-32.  The Final Results held that Kumar's failure to cooperate with Commerce's request for its affiliation status with Companies A and B meant Commerce was unable to determine whether:  (1) Kumar's home market sales to Company A were sales to an affiliate that would require data for downstream sales; and (2) Kumar's purchases of major inputs from Company B were purchases from an affiliated supplier that would warrant the application of the major input rule and a potential cost adjustment.  *See id* at 28.

## SUMMARY OF THE ARGUMENT

The Court should sustain Commerce's Final Results because Commerce's application of adverse facts available is supported by substantial evidence and in accordance with law. Commerce repeatedly requested Kumar to provide necessary information on its affiliation status, but throughout Kumar's several questionnaire responses, it failed to do so.  Instead, it provided conflicting records, including tax returns suggesting that one of its partners was receiving income from Companies A and B, despite Kumar's assertion to the contrary.  Kumar's attempt to explain this discrepancy was unpersuasive, and even if true, failed to fully address Commerce's concerns.  Accordingly, Commerce concluded that it could not reliably determine the nature of Kumar's affiliation with Companies A and B.  Without reliable information on those affiliations, Commerce could not calculate an accurate dumping margin, which is a central component of an antidumping duty administrative review.

Therefore, Kumar's insufficient and conflicting questionnaire responses created a gap in the record that Commerce lawfully filled by using facts otherwise available.  Furthermore, Kumar's questionnaire responses demonstrate that it failed to cooperate because it did not act to the best of its ability to provide full responses to Commerce's questions.  This failure justified Commerce's use of an adverse inference when selecting from among the facts otherwise available on the record.

## ARGUMENT

### I.  Standard Of Review

In reviewing Commerce's antidumping duty determinations, the Court sustains any determination made by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  *Tianjin Tiancheng Pharm. Co. v. United States*, 366 F. Supp. 2d 1246, 1249 (Ct. Int'l. Trade 2005) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938).  Even if it is possible to draw two inconsistent conclusions from the record evidence, this does not mean that Commerce's findings are unsupported by substantial evidence.  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  When Congress entrusts an agency to administer a statute in fact-intensive situations, as here, the agency's conclusions should be reversed only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion.  *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992).  Hence, this Court will affirm Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusions.  *Atl. Sugar, Ltd.*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).  Additionally, this Court reviews Commerce's conduct of its administrative proceedings under the abuse of

discretion standard.  *See*, *e.g.*, *Carpenter Tech. Corp. v. United States*, 2002 Ct. Intl. Trade

LEXIS 76 (Ct. Int'l Trade July 30, 2002); *Uniroyal Marine Exps. Ltd. v. United States*, 626 F.

Supp. 2d 1312, 1316 (Ct. Int'l. Trade 2009).

## II. Commerce's Application Of Adverse Facts Available Was Appropriate Because There Was Insufficient Evidence On The Record To Determine Kumar's Affiliation With Companies A and B

Commerce's decision to apply facts available with an adverse inference, because Kumar

failed to provide necessary information concerning its affiliation status with Companies A and B,

is supported by substantial evidence and in accordance with law.

During an antidumping duty administrative review, Commerce gathers information from

respondent foreign producers and exporters to determine whether dumping has occurred and, if it

has, to calculate dumping margins.  It is the respondent's burden to create an accurate record

during Commerce's review.  *Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir.

1993) ("The burden of production should belong to the party in possession of the necessary

information.").  If the resulting record does not contain all information Commerce needs to

complete its calculations, Commerce conducts a two-step inquiry to determine (1) if it is

appropriate to use "facts otherwise available" to fill gaps in the record, and (2) if it is

appropriate, when selecting among facts otherwise available, to use facts adverse to the interests

of the party responsible for the missing information.

### A.    Commerce Reasonably Decided To Use Facts Otherwise Available

Commerce will use "facts otherwise available" to fill gaps in the record if: (1) necessary

information is not available, or (2) an interested party (a) withholds information requested by

Commerce, (b) fails to provide the information in the form or in the manner requested, (c)

significantly impedes the proceedings, or (d) provides information that cannot be verified.

19 U.S.C. § 1677e(a).  Before Commerce applies facts otherwise available, it must inform the respondent about the nature of the deficiency and allow the respondent an opportunity to explain or to remedy the deficiency to the extent practicable.  *See* 19 U.S.C. § 1677m(d).

In this case, Commerce reasonably determined that because Kumar did not provide reliable information as to whether it was affiliated with Companies A and B, necessary information was not available on the record, Kumar withheld requested information, and Kumar thereby significantly impeded the administrative review.  *See* IDM at 28.  Accordingly, it found the criteria of 19 U.S.C. § 1677e(a)(1), (2)(a) and (2)(c) satisfied, any of which would justify use of facts otherwise available.  *See* IDM at 28.

Initially, Kumar did not acknowledge any affiliation with Companies A and B.  At the outset of the administrative review, Commerce requested that Kumar identify all affiliates.  *See* Initial Questionnaire at A-3-6.  It also provided instructions on how to report information regarding affiliates, as well as a glossary of terms, which among other things, provides the statutory definition of affiliated persons.[3]  *Id.* at A-3-6, I-1-2.  The Initial Questionnaire specifically instructed Kumar to contact Commerce immediately if there was any uncertainty as to a particular company's affiliation.  *Id.* at G-10.  Throughout Kumar's Section A-D responses, as described above, Kumar consistently reported that it did not make any sales to, or purchases from, affiliated persons.  *See* Section A Response at 2.  It maintained that [███████████████]

---

[3]  Pursuant to 19 U.S.C. § 1677(33), "affiliated" persons include "two or more persons directly or indirectly controlling, controlled by, or under common control with, any person."  "{A} person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person."  Id.  In this context, "persons" also include corporate entities.  See 19 C.F.R. § 351.102(b)(3).  Commerce will not find that control exists unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product.  19 C.F.R. § 351.102(b)(3).

are affiliated with any other persons that are involved in the manufacture, sale, or development

of the product under review (including all inputs). *Id*. at 7; *see also* Exhibit A-3 to Section A

Response (C.R. 13). And while it acknowledged that the [                    ] has ownership interest

in other affiliated companies, it reported that none of these affiliates were engaged in the

development, production, sale or distribution of subject merchandise during the period of review.

*See id.* at 8. It characterized Companies A and B as "unaffiliated" companies. *See* Exhibits

26.3-26.4 to Third Sections B-D Supplemental Response (C.R. 175).

When asked directly about Companies A and B in a supplemental questionnaire,

however, Kumar acknowledged prior affiliations. It disclosed that its partners had sold

Company A before the beginning of the period of review, and that it previously jointly owned

Company B but had sold it in 2013. *See* Second Supplemental Response at 6. Kumar also

provided retirement deeds evidencing the Kumar partners' retirement from both Companies A

and B. *See id.*; *see also* Exhibits A-18 & A-18(a) to Second Supplemental Response (C.R. 130-

31).

Commerce then requested tax returns for Kumar's partners and requested that, if any of

Kumar's partners received income from either Company A or B, Kumar describe the nature of

the income and explain why it continued to receive income from these companies. S*ee* Third

Supplemental Questionnaire at 3. Kumar maintained that none of its partners received any

income from Company A or B during the period of review, but the tax returns it provided

demonstrated that a Kumar partner *had* received income from Companies A and B as a partner of

these two companies. Third Supplemental Response at 1-3; Exhibit A-21.1 to Third

Supplemental Response (C.R. 153); *see also* PDM at 6. This directly conflicted with the

provisions of the retirement deeds Kumar had provided, cast doubt on whether Kumar's

affiliation with Companies A and B had actually ended, and generally raised doubts as to the reliability of Kumar's reported information. *See* PDM at 6; IDM at 29; Preliminary AFA Memo at 1.

As required by 19 U.S.C. § 1677m(d), Commerce alerted Kumar of the discrepancy in its provided information and gave it an opportunity to explain it. *See* Fourth Supplemental Questionnaire at 5. Kumar claimed that the income its partner received from Companies A and B was actually "interest on the loans and payment" for the transfer of shares of Companies A and B. Fourth Supplemental Response at 4. The partner's tax consultant, according to Kumar, erroneously classified the interest income from advance and capital in Companies A and B as income from operation of the partnership in their draft income tax computation for the years 2019-2020 and 2020-2021. *Id.*

Commerce found this explanation inadequate, and this finding was wholly supported by the record. Kumar provided no explanation as to why the partner was receiving "interest on the loans and payment of consideration for transfer of shares . . . due upon retirement" from Companies A and B years after the partner allegedly retired in 2007 and 2013, respectively. Fourth Supplement Response at 4. Such payments are inconsistent with the retirement deeds, which provided that at the time of retirement [███████████████████████████ ████████████].[4] Accordingly, doubt remained as to whether the deeds could be relied

---

[4] Specifically, the deeds provided that the retiring partner ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████]. Exhibit A-18(a) to Second

on as evidence that the partner had fully retired.  Finally, Kumar provided no source documentation for the payments of "interest on the loans" and "consideration for transfer of shares", despite Commerce's explicit request for such documentation, such that there was little evidence to support that explanation.  Fourth Supplement Response at 2-4.

When it submitted its third supplemental response, along with the tax documents indicating that a Kumar partner had received income from both Companies A and B, there was no indication that this was merely a "draft" income tax return, as Kumar later alleged.  *See* Third Supplemental Response at 1-2 (stating that Kumar was "providing the income tax returns").  In the fourth supplemental response, Kumar provided documents purporting to be the finalized version of the tax documents, *see* Fourth Supplemental Response at Exhibits A-28 & A-29, but it provided no explanation for why the previously filed documents had not been identified as draft documents.

In short, Kumar consistently denied any affiliation with Companies A and B, or any uncertainty regarding that affiliation, and then denied the income its partner was receiving from Companies A and B, which was listed in its own tax documents, until Commerce specifically addressed that income and asked Kumar to explain the discrepancy.  Then, it provided a dubious explanation with limited documentary support that left several questions unanswered.  As Commerce explained in the IDM, "{m}isrepresentations and unreliable source documents regarding affiliation status are not the type of quantifiable deficiencies that can be addressed with modifications to the existing databases; rather, these deficiencies fundamentally undermine the credibility of the reported data themselves."  IDM at 30.   In other words, the discrepancies in

---

Supplemental Response at PDF p. 5-6 (C.R. 131); Exhibit A-23 to Third Supplemental Response at PDF p. 3 (C.R. 159).

Kumar's information cast general doubt on the truthfulness of Kumar's prior representations concerning Kumar's affiliations with Companies A and B.  *See* IDM at 29.

Whether or not Kumar was affiliated with Companies A and B was necessary information for Commerce's calculation of Kumar's dumping margin.  Commerce treats affiliated entities as a single entity for the purpose of antidumping duty calculations "to prevent affiliated entities from circumventing antidumping duties by channeling production of subject merchandise through the affiliate with the lowest potential dumping margin." *Prosperity Tieh Enter. Co. v. United States*, 965 F.3d 1320, 1323 (Fed. Cir. 2020) (citing *Slater Steels Corp. v. United States*, 279 F. Supp. 2d 1370, 1376, (Ct. Int'l Trade 2003)) (internal quotes and brackets omitted); *see also Carpenter Tech. Corp. v. United States*, 510 F.3d 1370, 1373 (Fed. Cir. 2007). Affiliate information is therefore necessary to calculate a reliable normal value to determine the existence of dumping.  19 U.S.C. § 1677(35)(A).  It is Commerce's duty to determine dumping margins "as accurately as possible," and a reliable normal value is critical for an accurate dumping margin.  *See Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990).  In Kumar's Section B and D responses, it reported sales to Company A as sales to an unaffiliated customer, and purchases from Company B as purchases from an unaffiliated supplier.  Third Sections B-D Supplemental Response at Exhibit 26.3-26.4 (C.R. 175); *see also* IDM at 28.  But Commerce could not rely on the characterization of these companies as unaffiliated, so it could not calculate an accurate dumping margin, which is a central component of an antidumping duty administrative review.

Accordingly, when Commerce concluded that the record ultimately lacked sufficient evidence to reliably determine Kumar's affiliation with Companies A and B, it was fully justified in finding that (1) necessary information was missing from the record, (2) Kumar had withheld

requested information, and (3) Kumar thereby significantly impeded the administrative review.

*See* IDM at 28.  As a result, its decision to use facts otherwise available was supported by

substantial evidence in the record and in accordance with the law.

### B.    Commerce Reasonably Decided To Apply Adverse Facts Available

If Commerce determines facts otherwise available are appropriate, it then determines

whether to apply adverse facts available pursuant to 19 U.S.C. § 1677e(b):

> If the administering authority . . . finds that an interested party has
> failed to cooperate by not acting to the best of its ability to comply
> with a request for information . . . , the administering authority . . .
> may use an inference that is adverse to the interests of that party in
> selecting from among the facts otherwise available{.}

*See also Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1295-96 (Fed. Cir. 2021).

The Federal Circuit has interpreted "best of its ability" to mean "one's maximum effort."

*Nippon Steel Corp. v United States*, 337 F.3d 1373, 1382–83 (Fed. Cir. 2003).  It has further

explained:

> The best-of-one's-ability standard "does not require perfection and
> recognizes that mistakes sometimes occur," but "it does not
> condone inattentiveness, carelessness, or inadequate record
> keeping*." Nippon Steel Corp. v. United States*, 337 F.3d 1373,
> 1382 (Fed. Cir. 2003). The standard expects respondents to "(a)
> take reasonable steps to keep and maintain full and complete
> records ...; (b) have familiarity with all of the records it maintains
> in its possession, custody, or control; and (c) conduct prompt,
> careful, and comprehensive investigations of all relevant records
> that refer or relate to the imports in question." *Id.*

*Papierfabrik August Koehler SE v. United States,* 843 F.3d 1373, 1379 (Fed. Cir. 2016).

This Court has reasoned that "intentional conduct, such as deliberate concealment or

*inaccurate* reporting, surely evinces a failure to cooperate."  *Hubbell Power Sys. v. United

States*, No. 15-00312, 2019 WL 6174713, at *2 (Ct. Int'l Trade Nov. 20, 2019) (*Hubbell Power*)

(quoting *Nippon Steel*, 337 F.3d at 1383) (emphasis added).  In addition, Commerce may apply

an adverse inference for a respondent's "failure to cooperate to the best of respondent's ability, *regardless of motivation or intent*." *Nippon Steel*, 337 F.3d at 1382 (emphasis added).  Further, the mere submission of a great deal of documentation to Commerce, in and of itself, does not signify cooperation when submissions contain identifiable errors and omissions. *See Hubbell Power*, 2019 WL 6174713, at *3 ("Gem-Year undoubtedly submitted a great deal of documentation to Commerce, but quantity is not a definitive indicator of cooperation.").

 In this case, Commerce determined that Kumar did not exert the maximum effort to provide complete answers because despite multiple requests from Commerce, Kumar repeatedly denied and/or failed to submit documents clearly explaining its affiliation status with respect to companies A and B.  PDM at 7.  As explained in the previous section, Kumar instead provided inconsistent information as to whether its partner was continuing to receive income from Companies A and B, and provided a dubious explanation that, even if true, failed to fully explain the discrepancies.  Thus, Commerce concluded that Kumar was: (1) inattentive to the importance of the affiliation issue in connection with Companies A and B; and (2) careless in providing accurate, usable information concerning its affiliation status with Companies A and B.  IDM at 32.  Commerce therefore determined that use of an adverse inference when selecting from among the facts otherwise available on the record, within the meaning of 19 U.S.C. § 1677e(b), was reasonable because Kumar did not cooperate to the best of its ability in response to Commerce's requests for information concerning its affiliation status.

Kumar makes several arguments as to why it was unreasonable to find that it did not cooperate to the best of its ability, but none is persuasive.  First, Kumar argues there is no evidence that Kumar withheld or failed to provide the information Commerce requested and that it provided the maximum effort to provide Commerce with full and complete answers.  Kumar

17

Br. at 9-12 (citing *Nippon Steel*, 337 F.3d at 1382).  However, Commerce was required to issue

multiple questionnaires before Kumar disclosed its partner's history with Companies A and B.

*See* Fourth Supplemental Response at 4.  In *Shandong Huarong Machinery Co., Ltd. v. United*

*States*, the Court held that the respondent companies significantly impeded Commerce's

investigation when the responses to the Initial Questionnaire were inadequate and "Commerce

was required to issue several supplemental questionnaires in order to get the necessary

information to complete its investigation."  *Shandong Huarong Machinery Co., Ltd. v. United*

*States*, 435 F. Supp. 2d 1261, 1277 (Ct. Int'l Trade 2006).  The Court agreed that even though

the companies eventually disclosed their relationships, "their failure to do so until after the

issuance of several supplemental questionnaires surely significantly impeded Commerce's

investigation by requiring the agency to prolong its review" and Commerce's use of facts

otherwise available was warranted.  *Id*.[5]  Moreover, even when Kumar disclosed its partner's

history with Companies A and B, it provided conflicting information as to whether the partner

continues to receive income from those companies, which it failed to adequately explain, as

discussed above.

Next, Kumar argues that Commerce should consider "the nature of the mistake" and that

Commerce should "carry out a case-specific analysis for applying adverse inference, a tool

which should be wielded primarily for its deterrent effect."  Kumar Br. at 12 (citing *Timken U.S.*

---

[5]  *See also Gerber Food (Yunnan) Co., Ltd. v. United States*, 491 F. Supp. 2d 1326, 1347 (Ct.
Int'l. Trade 2007) (holding that the respondent "impeded the review proceeding by providing
questionnaire responses that were evasive, misleading, and, in some instances, false with respect
to the same facts."); *National Nail Corp. v. United States*, 390 F. Supp. 3d 1356, 1385 (Ct. Int'l
Trade 2019) (holding that Commerce's ability to conduct a review was significantly impeded
when the respondent failed to provide the necessary information repeatedly requested by
Commerce); *Deosen Biochemical Ltd. v. United States*, 301 F. Supp. 3d 1372, 1378-79 (Ct. Int'l
Trade, 2018) (holding that the respondents impeded Commerce's investigation by concealing the
nature of their business relationships in their questionnaire responses).

*Corp. v. U.S.*, 434 F.3d 1345 (Fed. Cir. 2006); *De Mexico v. United States*, 753 F.3d 1227 (Fed.

Cir. 2014), *Changzhou Wujin Fine Chemical Factory Co., Ltd. v. United States*, 701 F.3d 1367,

1379 (Fed. Cir. 2012)).  However, Commerce did consider the specifics of Kumar's case when it

determined that Kumar was not forthcoming in its responses to Commerce, and that the

information provided raised doubt about the accuracy and completeness of the information

submitted.  *See* IDM at 23-32; PDM at 5-7; Preliminary AFA Memo at 1-2.  The Federal Circuit

has explained that a respondent's failure to disclose its affiliates is core to the antidumping duty

analysis and undermines Commerce's ability to rely on its submissions.  *Ad Hoc Shrimp Trade*

*Action Committee v. United States*, 802 F.3d 1339, 1357 (Fed. Cir. 2015).  Kumar's insufficient

and inconsistent questionnaire responses rendered its information regarding affiliation status with

Companies A and B unreliable and therefore unusable, and justified Commerce's use of adverse

facts available to determine a dumping margin for Kumar.

Kumar also cites various cases suggesting that certain errors are not serious enough to

justify an adverse inference.  For instance, Kumar argues that an adverse inference is not to be

"drawn merely from a failure to respond," that it is "only appropriate in circumstances in which

it is reasonable for Commerce to have expected that more forthcoming responses should have

been made," and that "{t}he mere fact that a respondent cannot obtain the requested information,

or that the respondent did not properly answer a question, does not automatically constitute

substantial evidence of failure to cooperate to the best of its ability."  Kumar Br. at 12-13 (citing

*Borden, Inc. v. United States*, 4 F. Supp. 2d 1221 (Ct. Int'l Trade 1998); *Myland Industrial, Ltd.*

*v. United States*, Slip Op. 07 - 154, (Ct. Int'l Trade Oct. 25, 2007); *Mannesmannrohren-Werke*

*AG & Mannesmann Pipe & Steel Corp. v. United States*, 77 F. Supp. 2d 1302, 1316 (Ct. Int'l

Trade 1999).  However, Commerce did not "automatically" apply an adverse inference in this

case as the result of some inadvertently omission or lack of access to information.  Rather, Commerce found that Kumar consistently withheld accurate information regarding its affiliations with Companies A and B over the course of numerous questionnaires, that it provided conflicting information suggesting it may have been concealing continued affiliations with those companies, and that its inadequate attempt to explain its inconsistencies generally undermined the reliability of its data.

Finally, Kumar argues that there is sufficient data on the record to calculate a margin for Kumar for this review.  Kumar Br. at 13-14.  Specifically, Kumar argues that since it reported all its U.S. sales, home market sales, cost data, and cost of production, Commerce could have calculated an accurate dumping margin for Kumar, but instead "ignored the factual record" and chose to calculate an inaccurate rate using an adverse inference.  *Id.*  This argument appears to assume that Commerce accepts Kumar's assertion that there is no remaining doubt as to Kumar's affiliations with Companies A and B.  However, as has already been explained in detail, Commerce ultimately concluded that the information regarding those affiliations was unreliable, and without knowing whether those companies were affiliated with Kumar, Commerce could not accurately calculate the dumping margin.

The Statement of Administrative Action (SAA) provides that Commerce "may employ adverse inferences about the missing information to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."  Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, vol. 1, at 870 (1994) (SAA).  The SAA also notes that Commerce should consider "the extent to which a party may benefit from its own lack of cooperation."  *See id.*  Here, Commerce explained that "the amount of data affected by Kumar's failure to provide accurate and complete

information concerning its affiliation status is substantial" and that "use of partial AFA or neutral

facts available would not permit {Commerce} to resolve the issues with Kumar's reporting."

*Id.*; *see also* Preliminary AFA Memo at 1-2. Therefore, there is not sufficient data on the record

to calculate Kumar's rate, and Commerce properly relied on adverse facts available to determine

the final rate of 13.61 percent.

## **CONCLUSION**

For these reasons, we respectfully request that the Court sustain Commerce's

determination and enter judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICA M. McCARTHY
Director

/s/ Claudia Burke
CLAUDIA BURKE
Assistant Director

OF COUNSEL:                                          /s/ Kelly M. Geddes
Jared M. Cynamon                                 KELLY M. GEDDES
Attorney                                                  Trial Attorney
Office of the Chief Counsel                     Commercial Litigation Branch
   for Trade Enforcement and Compliance   Civil Division
U.S. Department of Commerce               Department of Justice
Washington, D.C.                                   P.O. Box 480
Telephone:  (202) 482-0131                   Ben Franklin Station
                                                              Washington, D.C.  20044
                                                              Telephone: (202) 307-2867
                                                              Facsimile: (202) 305-2062
                                                              Email: kelly.geddes2@usdoj.gov

Dated September 26, 2022                      *Attorneys for Defendant*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the word-count limitation, in that it contains 6244 words according to the word-count function of the word-processing software used to prepare the memorandum, including text, footnotes, and headings.

/s/ Kelly M. Geddes

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 26th day of September, 2022, I electronically filed a copy of the foregoing using the CM/ECF system, which sent a notification of such filing to counsel of record.

<u>/s/ Kelly M. Geddes</u>