Slip Op. 23-166

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| KUMAR INDUSTRIES,<br><br>                    Plaintiff,<br><br>       v.<br><br>UNITED STATES,<br><br>                    Defendant. | Before:  Timothy C. Stanceu, Judge<br><br>Court No. 21-00622 |

### OPINION

[Sustaining an agency decision concluding an administrative review of an antidumping duty order]

Dated: November 22, 2023

*Lizbeth R. Levinson*, Fox Rothschild LLP, of Washington, D.C., for plaintiff.  With her on the briefs were *Ronald M. Wisla* and *Brittney R. Powell*.

*Kelly Geddes*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant United States.  With her on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Claudia Burke*, Assistant Director, Commercial Litigation Branch.  Of counsel on the brief was *Jared M. Cynamon*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

Stanceu, Judge: Plaintiff contests a determination the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") issued to conclude the first administrative review of an antidumping duty ("AD") order

on imported glycine from India. In the contested determination, Commerce assigned Kumar an antidumping duty rate of 13.61%.

Before the court is Kumar's motion for judgment on the agency record, submitted under USCIT Rule 56.2. The court denies the motion and sustains the Department's determination.

## I. BACKGROUND

### A. The Parties to this Action

Kumar, an Indian manufacturer and exporter of glycine, was a mandatory respondent in the underlying antidumping duty investigation and in the first administrative review. Summons 1 (Dec. 10, 2021), ECF No. 1; Compl. ¶ 4 (Jan. 10, 2022), ECF No. 8. Defendant is the United States.

### B. The Contested Determination

Commerce published the determination at issue (the "Final Results") in 2021 to conclude an antidumping duty administrative review on glycine from India (the "subject merchandise"). *Glycine From India: Final Results of Antidumping Duty Administrative Review; 2018–2020*, 86 Fed. Reg. 62,508 (Int'l Trade Admin. Nov. 10, 2021) ("*Final Results*").

The Final Results incorporated by reference an explanatory document, the "Final Issues and Decision Memorandum." *Glycine from India: Issues and Decision Memorandum*

*for Final Results of Antidumping Duty Administrative Review; 2018–2020* (Int'l Trade Admin. Nov. 4, 2021), P.R. Doc. 200 ("*Final I&D Mem.*").[1]

### C. Proceedings before Commerce

Commerce concluded an antidumping duty investigation of glycine from India in 2019, determining that the subject merchandise was being sold in the United States at less than fair value. *Glycine From India: Final Determination of Sales at Less Than Fair Value*, 84 Fed. Reg. 18,487 (Int'l Trade Admin. May 1, 2019). After the U.S. International Trade Commission (the "ITC") determined that imports of glycine were injuring the domestic glycine industry, *Glycine from China, India, and Japan; Determinations*, 84 Fed. Reg. 29,238 (Int'l Trade Comm'n June 21, 2019), Commerce issued an amended final affirmative less than fair value determination ("Amended Final LTFV Determination") and issued antidumping duty orders, including an order on glycine from India (the "Order"). *Glycine From India and Japan: Amended Final Affirmative Antidumping Duty Determination and Antidumping Duty Orders*, 84 Fed. Reg. 29,170 (Int'l Trade Admin. June 21, 2019).[2] In the Amended Final LTFV Determination, Commerce assigned Kumar a weighted average dumping margin of 13.61%. *Id.*, 84 Fed. Reg. at 29,171.

---

[1] Documents in the Joint Appendix (Dec. 5, 2022), ECF Nos. 35, 36, 37, 41 (Conf.), 38, 39, 42 (Public) are cited as "P.R. Doc __." All citations are to the public versions of these documents.

[2] The scope of the antidumping duty order includes "glycine," an amino acid, "at (continued . . .)

In 2020, Commerce initiated the first administrative review of the Order, designating the period of review ("POR") as October 31, 2018 to May 31, 2020. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 47,731, 47,734 (Int'l Trade Admin. Aug. 6, 2020). Commerce issued "Preliminary Results" and an accompanying "Preliminary Decision Memorandum" for the first administrative review in 2021, in which Commerce preliminarily assigned Kumar an antidumping duty rate of 13.61%. *Glycine From India: Preliminary Results of Antidumping Duty Administrative Review; 2018–2020*, 86 Fed. Reg. 35,733, 35,734 (Int'l Trade Admin. July 7, 2021) ("*Prelim. Results*"); *Glycine from India: Decision Memorandum for Preliminary Results of Antidumping Duty Administrative Review; 2018–2020* at 5–8 (Int'l Trade Admin. June 30, 2021), P.R. Doc. 164 ("*Prelim. Decision Mem.*"). Commerce assigned the same 13.61% rate in the Final Results. *Final Results*, 86 Fed. Reg. at 62,509; *Final I&D Mem.* at 35–36.

### D. Proceedings before the Court

Plaintiff commenced this action on January 10, 2022. Summons; Compl. Before the court is Kumar's motion for judgment on the agency record under USCIT Rule 56.2 and accompanying brief. Pl.'s 56.2 Mot. for J. on the Agency R. (July 27, 2022), ECF

---

any purity level or grade" and "all forms of crude or technical glycine including, but not limited to, sodium glycinate, glycine slurry and any other forms of amino acetic acid or glycine." *Glycine From India and Japan: Amended Final Affirmative Antidumping Duty Determination and Antidumping Duty Orders*, 84 Fed. Reg. 29,170, 29,172 (Int'l Trade Admin. June 21, 2019).

Nos. 23 (Conf.), 24 (Public); Mem. of Points and Authorities in Supp. of Pl.'s 56.2 Mot. for J. on the Agency R. (July 27, 2022), ECF Nos. 23 (Conf.), 24 (Public) ("Kumar's Br.").

Defendant United States opposes Kumar's motion. Def.'s Resp. in Opp'n to Pl.'s Mot. for J. Upon the Agency R. (Sept. 26, 2022), ECF Nos. 25 (Conf.), 26 (Public). Plaintiff replied to defendant's opposition. Pl.'s Reply Br. (Nov. 18, 2022), ECF No. 32.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

The court exercises jurisdiction according to section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c),[3] pursuant to which the court reviews actions commenced under section 516A of the Tariff Act of 1930 ("Tariff Act"), *as amended*, 19 U.S.C. § 1516a, including actions contesting final affirmative determinations that Commerce issues to conclude administrative reviews of antidumping duty orders. *See id*. §§ 1516a(a)(2)(B)(iii), 1675.

In reviewing an agency determination, the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." *Id*. § 1516a(b)(1). Substantial evidence refers to "such relevant evidence as a reasonable mind might

---

[3] Citations herein to the United States Code are to the 2018 edition. Citations to the Code of Federal Regulations are to the 2021 edition.

accept as adequate to support a conclusion." *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1378 (Fed. Cir. 2008) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

### B. Antidumping Duties under the Tariff Act

The Tariff Act provides for an "antidumping duty" to be assessed on imported merchandise if Commerce determines that the merchandise is being sold at less than fair value and if the ITC determines that an industry in the United States is materially injured or is threatened with material injury by reason of that merchandise or by reason of sales (or the likelihood of sales) of that merchandise for importation. 19 U.S.C. § 1673. The statute provides that the antidumping duty shall equal the "amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise." *Id*. In the ordinary circumstance, "[t]he normal value of the subject merchandise shall be the price . . . at which the foreign like product is first sold . . . for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade." *Id*. §§ 1677b(a)(1)(A), (B)(i).

### C. Derivation of the 13.61% Rate in the Final Results

The 13.61% antidumping duty rate Commerce assigned Kumar in the Final Results was not a dumping margin calculated from Kumar's sales during the POR. Instead, Commerce assigned Kumar a rate based on what it described as "total adverse facts available," or "total AFA." This term is a shorthand reference to the use of "facts otherwise available" under section 776(a) of the Tariff Act, 19 U.S.C. § 1677e(a), when

applied with "adverse inferences" under section 776(b) of the Tariff Act, 19 U.S.C. § 1677e(b). *See, e.g.*, *Glycine from India: Preliminary Application of Adverse Facts Available to Kumar Industries* at 1 (Int'l Trade Admin. June 30, 2021), P.R. Doc. 167 ("*Prelim. AFA Mem.*"). Commerce resorted to what it termed "total adverse facts available" based on several findings, including a finding that necessary information was not on the record and that Kumar failed to cooperate when it did not act to the best of its ability in responding to the Department's requests for information.

The dispute in this case is over the issue of whether Commerce lawfully invoked its authority under the facts otherwise available and adverse inference provisions. Kumar contests the various factual findings upon which Commerce relied, Kumar's Br. 4, arguing specifically that "Kumar provided all information requested in the form and manner requested in the initial questionnaire response and four supplemental questionnaire responses," *id*. (citing its responses to the Department's five questionnaires). Kumar maintains that Commerce should have reviewed Kumar's sales and calculated an actual weighted average dumping margin based on its sales. *Id*. at 13.

As an adverse inference, Commerce chose a rate equal to the estimated weighted average dumping margin it calculated for Kumar in the Amended Final LTFV Determination, which was 13.61%. *Final I&D Mem*. at 34–35.

### D. The "Affiliation" Issue in the First Review

"Affiliated persons" are defined by section 771(33) of the Tariff Act to include: "[m]embers of a family;" "[a]ny officer or director of an organization and such organization;" "[p]artners;" and "[a]ny person who controls any other person and such other person." 19 U.S.C. § 1677(33). "In determining whether control over another person exists, within the meaning of section 771(33) of the Act, the Secretary will consider the following factors, among others: Corporate or family groupings; franchise or joint venture agreements; debt financing; and close supplier relationships." 19 C.F.R. § 351.102(b)(3).

An affiliation of a foreign exporter or producer with its home market customers or its input suppliers affects significantly the Department's method of calculating normal value, and therefore, the dumping margin. For example, transactions "between affiliated persons may be disregarded" as transactions occurring outside the "ordinary course of trade." 19 U.S.C. §§ 1677b(a)(1)(B)(i) and (f)(2), 1677(15). The statute further provides that "sales at less than cost of production" may be disregarded when determining normal value, *id*. § 1677b(b), including "in the case of a transaction between affiliated persons involving the production by one of such persons of a major input to the merchandise" where the "amount represented as the value of such input is less than the cost of production of such input," *id*. § 1677b(f)(3) (describing the "major input rule"). Thus, to determine a proper dumping margin for Kumar, Commerce

would need to be informed of, and conduct an inquiry on, indicia of possible affiliation between Kumar and its home market customers and its input suppliers.

It is uncontested that in the first review, "a substantial portion of Kumar's home market sales" were made to a single company (to which the parties refer as "Company A"), and another single company ("Company B") "accounted for a substantial portion of Kumar's purchases of inputs necessary to produce glycine."[4] Kumar's Br. 2; *see Final I&D Mem.* at 29 ("Company A accounts for a substantial quantity and value of Kumar's home market sales and Company B accounts for a substantial quantity and value of Kumar's purchases of major inputs.") (footnotes omitted).

Commerce found that Kumar, in its responses to the Department's initial questionnaire, "did not identify two companies, Company A and Company B, as its affiliates," "reported its home market sales to Company A as sales to an unaffiliated home market customer," and "reported its purchases of major inputs from Company B as purchases from an unaffiliated supplier." *Final I&D Mem.* at 28 (footnotes omitted). Kumar does not dispute these findings and maintains, instead, that "[a] review of the record shows that Kumar responded unequivocally and consistently throughout the proceeding that Kumar was not affiliated with Companies A and B" and that "[t]here is

---

[4] The names of the companies are claimed by Kumar, and treated by the parties, as business proprietary information.

Case 1:21-cv-00622-TCS   Document 46   Filed 11/22/23   Page 10 of 17

Court No. 21-00622 Page 10

no ambiguity with respect to this point." Kumar's Br. 9; *see also id*. at 13 ("Kumar never waivered [*sic*] from its firm representation that it was not affiliated with Companies A and B."). Kumar argues, further, that it "reported all of its U.S. sales, home market sales and all cost data necessary to calculate the antidumping margin," *id*. at 13, including "explanations regarding all major elements required to accurately report the cost of production of glycine," *id*. at 13–14.

In supplemental questionnaires, Commerce inquired further about possible affiliations between Kumar (which is a partnership) and Companies A and B. Commerce stated that "[i]n our second supplemental questionnaire, we asked Kumar whether Companies A and B are affiliated with Kumar" and that "[i]n response, Kumar denied its affiliation with Companies A and B" and "explained that its partners sold their shares of Companies A and B prior to the POR." *Prelim. Decision Mem*. at 6 (footnotes omitted); *Second Suppl. Questionnaire* (Int'l Trade Admin. Feb. 1, 2021), P.R. Doc. 117. Kumar reported, specifically, that its partners previously had owned Company A and had jointly owned Company B but had sold their ownership in both companies before the start of the POR. *Kumar's Second Suppl. Questionnaire Resp*. at 6 (Feb. 24, 2021), P.R. Doc. 125 ("*Second Suppl. Questionnaire Resp*."); *see also* Kumar's Br. 10. Commerce stated that "[t]o support its explanation, Kumar provided retirement deeds showing that its partners sold their shares of Companies A and B before the POR." *Prelim Decision Mem*. at 6 (footnote omitted); *Second Suppl. Questionnaire Resp*. at

Exs. A-18, A-18(a) ("*Retirement Deeds*"). In response to the Department's request, Kumar also provided Commerce a list of its partners and their shares in other companies. *Second Suppl. Questionnaire Resp*. at Ex. A-13.

Commerce made further inquiries in a third supplemental questionnaire. Commerce asked that Kumar "describe the nature of" any income received by Kumar's partners "from any of the companies for which you provided a retirement deed" and, as to any such income, "explain why they continued to receive income from any of these companies." *Third Suppl. Questionnaire* at 3 (Int'l Trade Admin. Apr. 1, 2021), P.R. Doc. 137. Kumar responded that none of the partners "have received any income from any of the companies" for which it provided retirement deeds and that "[h]ence, this question is not applicable." *Kumar's Third Suppl. Questionnaire Resp*. at 3 (Apr. 22, 2021), P.R. Doc. 146 ("*Third Suppl. Questionnaire Resp*."). In response to the Department's request, Kumar provided copies of tax returns of the partners. *Id*. at Exs. A-21.1–A-21.4.

Commerce sought information on the nature of the income reported on the submitted copies of tax return documents in a fourth supplemental questionnaire. *Fourth Suppl. Questionnaire* (Int'l Trade Admin. May 10, 2021), P.R. Doc. 151. Commerce focused in particular on Kumar's main partner (who is identified in the submissions as "Partner 2," and for whose identity Kumar claims business proprietary treatment). Kumar's Br. 11; *see Kumar's Section A Questionnaire Response* at Ex. A-4 (Oct. 20, 2020), P.R. Doc. 35. Kumar previously had reported that Partner 2 was also formerly a partner

in Companies A and B but informed Commerce that Partner 2 had retired from the partnerships of Company A and Company B before the start of the POR. *Second Suppl. Questionnaire Resp.* at 6; *Retirement Deeds*. Kumar submitted a response to the fourth supplemental questionnaire on May 24, 2021. *Kumar's Fourth Suppl. Questionnaire Resp.*, P.R. Doc. 157 ("*Fourth Suppl. Questionnaire Resp.*").

### E. Kumar's Inadequate Explanations Pertaining to Income-Tax-Related Documentation for Partner 2

The issue presented by this case arises principally from copies of documents pertaining to Partner 2's income tax return for the 2020-2021 Indian tax assessment year (April 1, 2020 to March 31, 2021), which Kumar submitted to Commerce as an exhibit to its response to the third supplemental questionnaire. *Third Suppl. Questionnaire Resp.* at Ex. A-21.1. The documentation consists of a one-page document and three pages of computations. Commerce concluded from this document (and Partner 2's tax return for the previous tax assessment year) that Partner 2's "tax returns show that during the POR, this partner received income from Companies A and B as a partner of these two companies." *Final I&D Mem*. at 29. The three-page computation Kumar submitted, in response to the third supplemental questionnaire, for tax assessment year 2020-2021 (which overlapped the POR by two months, April and May of 2020), identifies significant amounts of income directly identified as having been sourced from Company A and from Company B. *See id.*; *Prelim. AFA Mem*. at 1–2 (explaining that

"[Partner 2's] 2020-2021 individual tax return" submitted in response to the third supplemental questionnaire "shows that he received share incomes from [Company A] and [Company B].").[5]

Kumar's response to the fourth supplemental questionnaire did not dispute that the three-page computation identifies income sourced from Companies A and B. Instead, Kumar maintained in the response that these amounts were listed in error and that the "amounts were in fact interest on the loans and payment of consideration for transfer of shares" due upon the November 6, 2007 retirement from Company A[6] and the May 11, 2013 retirement from Company B.[7] *Fourth Suppl. Questionnaire Resp*. at 4. The response explained, further, that the "tax consultant" of Partner 2 "has wrongly

---

[5] The tax return documentation for Partner 2's 2019-2020 taxes that Kumar submitted as an exhibit to its response to the third supplemental questionnaire does not identify specifically any income from Company A or Company B. Commerce speculated that a relationship to Companies A and B existed from certain income listed on a three-page computation for which no sources were specified.

[6] Kumar reported that Partner 2 retired from Company A on November 6, 2007. *Kumar's Fourth Suppl. Questionnaire Resp*. at 4 (May 24, 2021), P.R. Doc. 157. However, the Retirement Deeds indicate that Partner 2 retired from Company A on November 6, 2012. *Kumar's Second Suppl. Questionnaire Resp*. at Exs. A-18, A-18(a) (Feb. 24, 2021), P.R. Doc. 125.

[7] A term in the retirement deeds appears to be inconsistent with the deferred payments, as noted in the final Issues & Decision Memorandum. *Glycine from India: Issues and Decision Memorandum for Final Results of Antidumping Duty Administrative Review; 2018-2020* at 29 (Int'l Trade Admin. Nov. 4, 2021), P.R. Doc. 200 (citing *Glycine from India: Preliminary Application of Adverse Facts Available to Kumar Industries* (Int'l Trade Admin. June 30, 2021), P.R. Doc. 167)).

classified the interest income from advance and capital due in [Company A] and [Company B] as income from operation of the partnership in their draft income tax computation for the years 2019-2020 and 2020-2021." *Id*. Kumar submitted a different three-page document as an exhibit to its response to the fourth supplemental questionnaire that it labeled "Final Computation of Partner 2." *Id*. at Ex. A-28. In contrast to the "draft computation," the "final computation" does not list any income from Company A or Company B but lists an amount of "share" income and an amount of "interest" income and identifies the source for both as the transferee of the shares.

Commerce made several findings related to the affiliation issue in support of its use of "facts otherwise available" under 19 U.S.C. § 1677e(a), including that Kumar "withheld requested information, failed to provide information by the established deadlines, and significantly impeded this administrative review within the meaning of sections 776(a)(2)(a)-(c) of the [Tariff] Act [19 U.S.C. §§ 1677e(a)(2)(A)–(C)]." *Final I&D Mem*. at 28. The court need not consider whether these findings are supported by substantial record evidence, for it is sufficient for the purpose of invoking section 776(a) of the Tariff Act that, as Commerce also found, "necessary information is not available on the record." *Id*. (citing 19 U.S.C. § 1677e(a)(1)). The "necessary information" Commerce sought but did not obtain—in particular, in the fourth supplemental questionnaire—was information needed to allow Commerce to determine whether Kumar was affiliated with Company A or Company B during the POR. Commerce

could reach a valid finding on that issue only if it knew whether Partner 2 "received income from Companies A and B as a partner of these two companies." *Final I&D Mem*. at 29; *see* 19 U.S.C. § 1677(33). But Commerce lacked the determinative information it needed to resolve that issue.

Notably, the record lacked the information needed to reconcile the record evidence of the termination of the ownership interests of Partner 2 in Companies A and B with the conflicting information presented by the "draft computation" Kumar submitted for this partner in response to the third supplemental questionnaire. Instead of providing a reconciliation, Kumar's response to the fourth supplemental questionnaire raised more questions than it answered. For example, if, as Kumar told Commerce, Partner 2's tax consultant erroneously prepared the draft computation to include the income from Company A and Company B, then Commerce was left to question how this tax consultant could have come into possession of this detailed income information pertaining to Companies A and B and erroneously attribute it to Partner 2. Commerce reasonably could infer from Kumar's explanation that Kumar possessed, or at least readily could have obtained, the answer to that question.

The court need not conclude that substantial evidence supported the Department's finding that Partner 2 actually received the income on the "draft computation" from Companies A and B during the POR. *Final I&D Mem*. at 29. It is sufficient for purposes of 19 U.S.C. § 1677e(a)(1) that information Commerce needed to

reconcile the conflicting record information was not provided to it despite its inquiries. The missing information was "necessary information" within the meaning of that term as used in 19 U.S.C. § 1677e(a)(1).

The court also concludes that substantial evidence supports the Department's finding that Kumar's inadequate responses to the Department's inquiries on the affiliation issue "amount to a failure to cooperate to the best of its ability in responding to a request for information, within the meaning of section 776(b) of the Act [19 U.S.C. § 1677e(b)(1)]." *Final I&D Mem*. at 29. A party responding to a request for information must exert a "maximum effort to provide Commerce with full and complete answers." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). Kumar's responses to the Department's requests for information on the affiliation issue fell short of this standard. Kumar reasonably should have known that its responses to the Department's bringing the conflicting information to Kumar's attention were insufficient and, on the whole, unsatisfactory.

Kumar's argument that that the record contained all information necessary for Commerce to calculate a dumping margin is belied by the presence on the record of the conflicting, and unreconciled, evidence pertaining to the affiliation issue. As explained above, the method of calculating a margin would vary significantly depending on whether or not Kumar was affiliated with Company A or Company B, or both. At the end of the questionnaire process, and even by the end of the review, Commerce was left

with no way to resolve the affiliation issue factually in accordance with the record evidence. As a result, Commerce could not calculate an individual dumping margin for Kumar based on record evidence pertaining to the POR.

Kumar's argument that it fully cooperated in responding to the Department's information requests, such that Commerce lacked an evidentiary basis to invoke the "adverse inference" provision, is also unconvincing. Commerce reasonably could infer from the record evidence that the information needed to resolve the affiliation issue either was in Kumar's possession or was readily available to it.

### III. Conclusion

The court holds that the resort to what Commerce termed "total adverse facts available" was supported by the evidentiary record and 19 U.S.C. § 1677e. As discussed in the foregoing, Commerce permissibly found that the record lacked necessary information and that Kumar did not act to the best of its ability to respond to the Department's efforts to obtain that information. Therefore, the court will deny Kumar's motion for judgment on the agency record, sustain the Final Results, and enter judgment accordingly.

/s/ Timothy C. Stanceu  
Timothy C. Stanceu  
Judge

Dated: November 22, 2023  
       New York, New York